LOUISA J. HOLLIS, Respondent, *v.* THE DREW THEOLOGICAL SEMINARY et al., Impleaded, etc., Appellants.

Gifts to charitable, benevolent, scientific or educational institutions are not against public policy, and there is no public policy outside of the statutes which condemns testamentary gifts to such institutions, although contained in a will executed within two months of the testator's death.

The provision of the act of 1848 (§ 6, chap. 319, Laws of 1848), providing for the incorporation of such institutions, which declares invalid a devise or bequest to "any incorporation formed under this act," in a will not made and executed "at least two months before the death of the testator," applies only to corporations organized under that act and the acts amendatory thereof. (Chap. 239, Laws of 1861 ; chap. 526, Laws of 1881.)

Foreign corporations stand, in this particular, in the same position as domestic corporations.

Accordingly *held*, that a gift in a will, executed within two months of the testator's death to a foreign scientific and educational corporation which was empowered to take such gift by the law of the State where it was chartered, was valid.

*Kerr* v. *Dougherty* (79 N. Y. 327), *Lefevre* v. *Lefevre* (59 id. 434), distinguished.

In determining whether the will of a person who died "leaving a wife, child or parent," gives to corporations of the classes above specified more than the law permits, *i. e.*, more than one-half of his estate after payment of debts (Chap. 360, Laws of 1860), the whole estate must be treated as if converted into money at his death, and the money value of the portion or interest so given ascertained ; if this is not more than one-half of the whole, the statute has not been violated.

Where, therefore, the will of H. directed his executors to convert the bulk of his estate into money, to invest the same, and to pay the income of different portions thereof to certain persons named during their lives,

respectively, and upon their deaths gave the principal sums to certain scientific and educational corporations, *held*, that in determining whether the statutory limit had been exceeded, the value, at the time of the testator's death, of the portion of the estate so disposed of, should be ascertained, from which should be deducted the values of the life estates, computed according to the proper annuity tables, and the balance would represent the value of the remainders given to said corporations; and, it appearing that this was less than half the value of the testator's estate at the time of his death, that said bequests were valid.

(Argued February 1, 1884; decided February 26, 1884.)

APPEALS from order of the General Term of the Supreme Court, in the second judicial department, made May 14, 1883, which reversed a judgment entered upon a decision of the court on trial at Special Term.

This action was brought for the purpose of obtaining an adjudication as to the validity of certain bequests to charitable uses in the will of William H. Hollis, deceased.

The material facts are stated in the opinion.

*Josiah T. Marean* for appellants.  Section 6 of chapter 319 of the Laws of 1848, does not, by its own unaided force, make void the bequests to the Drew Theological Seminary and the Wesleyan University. (*Stephenson* v. *Short*, 92 N. Y. 433.) The legacies to charitable uses were valid in any event to the extent of one-half the estate after payment of the testator's debts. (Laws of 1860, chapter 360.) The Northampton tables furnish the standard data from which in the absence of other evidence the present value of annuities and endowments depending on lives may be ascertained.  When the legal rate of interest is six per cent, the value of the annuity or endowment is taken on the basis of five per cent, to allow for losses by interruptions in investments. (Supreme Court Rule, 71; *Schell* v. *Plumb*, 55 N. Y. 592; *Sauter* v. *N. Y. C. R. R.*, 6 Hun, 447.) The expectation of life is less by the Northampton or Carlisle tables than by the American Experience tables.  (American Experience Table, Laws of 1868, p. 1317; 1 Northampton Table in Jones on Annuities, 235-6-7.)

*Walter L. Livingston* for Mrs. Hollis. The bequests to the Drew Theological Seminary and Wesleyan University are void, by reason of the fact that the will was executed within two months of the testator's death. (*Sherwood* v. *Am. Bible Soc.*, 4 Abb. Ct. of App. 227, 232; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424, 432; *People* v. *Asso. of Phila.*, 92 id. 311, 324.) The comity by which the existence of foreign corporations is recognized here will not be carried to the extent of enforcing a claim in their favor in violation of the general policy of this State. (*White* v. *Howard*, 52 Barb. 294, 309; *B'k of Augusta* v. *Earle*, 13 Peters, 519; *Bond* v. *Poole*, 2 Kern. 495; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424, 434; *Despard* v. *Churchill* 53 id. 192; *People* v. *F. Ass. of Phila.*, 92 id. 324.) It is against the policy of this State to uphold bequests made to a certain class of corporations by a testator within two months of his death. (Const., art. 8, § 1; *Johnson* v. *H. R. R. R. Co.*, 49 N. Y. 455, 458; Willard's Eq. Juris. 576; *Beekman* v. *People*, 27 Barb. 260, 299, 305; *Kerr* v. *Dougherty*, 79 N. Y. 327, 339; *Levy* v. *Levy*, 33 id. 97, 118; *Stephenson* v. *Short*, 92 id. 433, 444.) While it is not necessary to contend that the restrictions contained in the act of 1848 apply to all domestic corporations of the class referred to, whether incorporated by special act or under the general law, it may be that they do. (*Marx* v. *Glynn*, 88 N. Y. 357, 376; *Beekman* v. *People*, 27 Barb. 260, 304, 305; *Johnson* v. *H. R. R. Co.*, 49 N. Y. 455, 458.) It may well be said that if the legislature creates by special act a corporation of the same class as those formed under the general law, and does not either in express terms, or by reference to the general act make such corporation subject to its restrictions and limitations, that it thereby intends to exempt such corporation from those restrictions and limitations. (*Lawrence* v. *Elliott*, 3 Redf. 235, 242; *Rochester* v. *Barnes*, 26 Barb. 657, 662; *Lefevre* v. *Lefevre*, 59 N. Y. 434, 448.) A statute may declare the general policy of the State notwithstanding that there may be exceptions to it; for instance, it is the general policy of the State that corporations shall not take by devise, and therefore

foreign corporations cannot; but domestic corporations may be authorized by their charters to do so. (2 R. S. 57, § 3; *White* v. *Howard*, 52 Barb. 294, 309; affirmed, 46 N.Y. 144, 163–166.) If the act of 1848 does not apply to the bequests to the appellants, they still must abate, because they exceed one-half the estate of the testator after payment of his debts. (Laws of 1860, ch. 360; *Chamberlain* v. *Chamberlain*, 3 Lans. 348, 358; *Savage* v. *Sherman*, 24 Hun, 307, 314; Justinian Inst., cited by Judge Fullerton in *Harris* v. *Am. Bible Soc.*, 2 Abb. Ct. of App. 316, 324; *Kearney* v. *Missionary Soc. of St. Paul*, 10 Abb. N. C. 274; *Matter of Leary's Estate*, 11 Tucker, 233.) The object of the act of 1860 was to protect the wife, children and parents of a testator. (*Chamberlain* v. *Chamberlain* 43 N. Y. 424, 440.) It is only the residue left after payment of the other legacies mentioned which the testator intended to give to the appellants. (Roper on Legacies, 411; Wms. on Exrs. 1360.) The general rule as to the abatement of legacies cannot be changed at the election of the appellants, and not even by the language of the will, unless the intention of the testator is expressed beyond any doubt. (Wms. on Exrs., 1369, 1370.)

Earl, J. William H. Hollis died on the 7th day of February, 1881, leaving a will executed December 13, 1880, less than two months prior to his death. He left a widow and father, and an estate consisting of real and personal property of the value, at the time of his death, of $118,000, over all incumbrances and debts. After certain specific legacies he directed a conversion of all the residue of his estate, both real and personal, into money, and after making certain bequests to various persons, he directed his executrix to invest the sum of $20,000, and keep the same invested during the life of his father, to collect the interest and income thereof, and to pay over the same semi-annually to his father during his life, and upon his death he gave and bequeathed the principal sum to the Drew Theological Seminary at Madison, New Jersey; and he directed

his executrix, in the same way, to invest another sum of $20,000 for the benefit of Mrs. Ingersoll for life, and after her death he gave and bequeathed that sum to the Wesleyan University at Middletown, Connecticut; and he directed his executrix to invest all the remainder of his estate, and to keep the same invested, and to receive and pay over the income thereof annually to his wife during her life, and upon her death he directed that such residue should be divided equally between the Drew Theological Seminary and the Wesleyan University.

The Drew Theological Seminary was a scientific and educational corporation, chartered under the laws of the State of New Jersey, and empowered by such laws to take bequests of personal property. The Wesleyan University was a similar corporation, chartered under the laws of Connecticut, and authorized by such laws to take bequests of personal property.

This action was brought for the purpose of obtaining an adjudication as to the validity and effect of these bequests to the two foreign corporations named; the plaintiff claiming that they were absolutely void under section 6 of chapter 319 of the Laws of 1848, because the will was executed within two months before the death of the testator. That claim was upheld by the Supreme Court, and the two corporations have appealed from its judgment to this court.

The act of 1848 is entitled "An act for the incorporation of benevolent, charitable, scientific and missionary societies," and section 6 is as follows: "Any corporation formed under this act shall be capable of taking, holding and receiving any property, real or personal, by virtue of any devise or bequest contained in any last will or testament of any person whatsoever, the clear annual income of which devise or bequest shall not exceed the sum of $10,000, providing no person leaving a wife or child or parent, shall devise or bequeath to such institution or corporation, more than one-fourth of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of such one-fourth; and no such devise or bequest shall be valid in any will which shall not

have been made and executed at least two months before the
death of the testator."

The whole of that section clearly has exclusive reference to
corporations formed under that act, and the prohibition con-
tained in the latter clause of the section is simply aimed at
devises and bequests made to such corporations ; and such is the
effect of our decisions in *Chamberlain* v. *Chamberlain* (43 N. Y.
424), *Lefevre* v. *Lefevre* (59 id. 434), *Kerr* v. *Dougherty* (79 id.
327), and *Stephenson* v. *Short* (92 id. 433). As there was not
a similar prohibition in the charter of either of these corpo-
rations, these bequests cannot be condemned by the letter of
any statute. So much is clear.

But the claim is made that that section indicates the general
policy of this State in reference to bequests to such corpora-
tions as are therein mentioned, and hence that these bequests
contained in this will, made within two months before the
death of the testator, are in violation of the general public
policy of the State, and must, therefore, be condemned on
that account.

The courts will not enforce contracts or the payment of leg-
acies which are against public policy. But it is not always easy
to determine when contracts and legacies are against public
policy. Some cases are plain and have been settled by the re-
peated decisions of the courts. Contracts tending to under-
mine public morals, to endanger the public health or the pub-
lic safety, to prevent competition at judicial sales, to improp-
erly influence legislation or the action of public officers or the
administration of justice, and to unreasonably restrain trade
or marriage ; all these have been condemned as against public
policy. In condemning such contracts judges have acted upon
what they deemed sound public policy, and have undoubtedly,
in some measure and in a remote sense, assumed legislative func-
tions. It is difficult to define and limit the power thus to en-
force public policy which is not found in the statute law, and
it should be exercised only in clear cases, and generally within
limits already defined by decisions of acknowledged authority,
based upon rules of the common law. There is certainly no

occasion for stretching the power so as to apply it to new or doubtful cases in a State where the legislature is in session one-third of the year, and thus competent to indicate the public will as to any line of supposed public policy. In a juridical sense, public policy does not mean simply sound policy, or good policy; but as defined by Daniel Webster in the *Girard Will Case* (2 How. [U. S.] 127) it means the policy of a State established for the public weal " either by law, by courts or general consent." In the same case Judge STORY, speaking of the public policy which was invoked in that case to condemn a provision contained in the Girard will, said : " Nor are we at liberty to look at general considerations of the supposed public interests, and policy of Pennsylvania upon this subject beyond what its Constitution and laws, and judicial decisions make known to us. The question, what is the public policy of a State, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ." Whatever the law condemns is against the policy of the law, and whatever the law expressly, albeit unwisely, permits, cannot be condemned by the courts as against public policy.

Contracts which are held to contravene public policy are always essentially vicious or always have evil tendencies. They are not sometimes valid and sometimes invalid, but are always invalid, and the courts will never tolerate or enforce them.

The general rule is that one may do with his property as he pleases. He may dispose of it by will in any way that suits his fancy or his judgment. He may give it all to strangers and thus disinherit his relatives. He may give it all to natural persons or to corporations capable of taking. He may give it directly or create trusts which the law allows; and this general power of disposition he possesses down to the last hour of conscious, intelligent existence.

It is not against public policy to allow gifts to charitable, benevolent, scientific or educational institutions. The law al-

lows and encourages such gifts, and those who make them are commended as the benefactors of their race. Such institutions dotted all over our land, to succor, elevate, educate men and ameliorate their condition, are distinguishing features of our modern civilization.

It is just as praiseworthy to give to these institutions by will, within two months before a testator's death, as at an earlier date. There is nothing essentially evil or of evil tendency in gifts thus made. They do not disturb the public weal. But it so happened that testators in the imminence of death, unduly influenced by hopes or fears or by the importunities of interested parties, sometimes gave improvidently to such institutions, disregarding the claims of near relatives, forgetting the maxim that "charity begins at home," and hence when the legislature came to frame a general law for the incorporation of these institutions by any persons who choose to associate for that purpose, it devised the limitations found in the act of 1848. The limitations, as above stated, applied only to corporations formed under that act, and those were corporations for " benevolent, charitable, scientific and missionary purposes." That act was so amended by chapter 239 of the Laws of 1861, and chapter 526 of the Laws of 1881, as to authorize the formation of corporations for many other purposes. In the act of 1848 the corporations could take by devise, or bequest property, the clear annual income of which should not exceed $10,000. That limitation was extended by chapter 641 of the Laws of 1881 to $50,000. Under the act of 1848 no person leaving a wife or child or parent, could devise or bequeath to one of the corporations organized in pursuance thereof, more than one-fourth (since altered to one-half) of his estate, and no such devise or bequest would be valid unless in a will executed at least two months before the death of the testator. These limitations indicate the varying policy of the legislature as to the corporations to be formed under that act. They were not applied to the numerous corporations of a similar character which had been formed under special charters prior to 1848, and they never have been applied to strictly re-

ligious corporations which are formed under other acts. Since 1848 a large number of such corporations have been formed by special charters to which the two· months limitation was not made applicable. In one of the opinions delivered in the case of *Kerr* v. *Dougherty* it was said that between that year and the year 1870 nearly one hundred and fifty acts were passed creating new corporations, or extending and enlarging the powers of old corporations similar to those named in the act of 1848, and that the two months limitation was imposed upon but few of such corporations; and since 1870 similar action has been taken many times by the legislature. How can it be said then that there is any general public policy as to the two months limitation? When the legislature has desired its imposition it has imposed it, and thus far indicated its policy. As stated, it has not imposed it upon the many corporations which existed prior to 1848, and since that date it has sometimes imposed it and sometimes not. It has never set up the limitation against devises and bequests to foreign corporations of any kind. A very significant fact is, that in 1860 (chap. 360) the legislature dealt with the other limitation and made it applicable to all corporations of the class to which the appellants belong, whether organized under the act of 1848 or not, by providing that no testator could devise or bequeath more than one-half of his estate to such corporations. If such was to be the general policy of the State, why was not the two months limitation also made applicable in terms to all such corporations? It is not within the province of the courts to extend the two months limitation to all such corporations, when the legislature has not only failed to do so, but when it has, in nearly every year since 1848, purposely omitted to extend it to corporations created or dealt with by it. That cannot be enforced as public policy by the courts which the legislature one day prohibits, in some cases, and another day permits in other cases. If there were a general law in this State that no bequest to any of such corporations should be valid, unless contained in a will made at least two months before the death of the testator, that would indicate a general public

policy which the courts of this State would enforce against foreign corporations which might come into this State, although such a limitation was not imposed by the laws creating them.

The general policy sought to be enforced by the statute is the prohibition of improvident and unjust wills, which deprive the relatives and dependents of the testator of proper consideration in the distribution of his estate, not the simple prohibition of wills made within two months prior to death. Such wills, as before stated, are not evil, or in their nature of evil tendency. A person, even if seized with a fatal disease, may be precisely as able to make a just and discrete will within two months of his death as at any other period of his life. He may make his will within the two months while in perfect health, without any expectation of the proximity of death. Such wills become evil only, like all wills, when they fail to deal fairly and justly by those persons who have claims upon the testator's care and bounty ; and the policy of the statute is to protect such persons, and this it does by a general rule. There is no policy outside of the statute which condemns such wills. The policy is found only in the statute, and reaches no further than the statute.

It is true, in a certain sense, that foreign corporations come into this State and assert their existence and exercise their powers here by comity — that is the State can, through its legislature, forbid their entry, and the exercise of their powers here. But it is not a comity to be enforced by the courts. Unless the legislature forbids, they can come here as freely as natural persons, and exercise here all the powers conferred upon them by their charters, subject to the same limitations imposed upon natural persons — that is, they can do no acts in violation of our laws or of our public policy. But unless prohibited by law, they can do here, within the limits of their chartered powers, precisely what domestic corporations could do. If these appellants had been domestic corporations the two months limitation would not have applied to them, and so it cannot be applied to them as foreign corporations. They must stand here in this case upon the same footing

as if they had been created here. (*Sherwood* v. *American Bible Society*, 4 Abb. Ct. of App. Dec. 227.) It would be a bold claim for any one to make, that the courts in the enforcement of a supposed public policy could apply this limitation to the numerous domestic corporations to which the statute law has not applied it, and no more can it be applied to foreign corporations without the sanction of law.

These views are substantially sustained by the case of *Kerr* v. *Dougherty*, upon which the plaintiff seems quite largely to rely. In that case one of the questions for determination was the validity of a bequest to the Union Theological Seminary of the city of New York. If the bequest to that corporation could have been condemned by the direct language of section 6 of the act of 1848, or because the bequest was made in a will executed within less than two months before the death of the testator, and hence was against the public policy of the State, the question could easily have been determined. But the bequest there was condemned solely upon the ground that by an amendment of the charter of that corporation, section 6 of the act of 1848 had been made applicable to it. There too there was under consideration a bequest to a Pennsylvania corporation, and if that bequest had been void as against the public policy of this State, there would have been no occasion to resort to the law of Pennsylvania, and to hold, as we did, that the bequest was void, because of an act of that State which prohibited such bequests by a will executed within a month before the death of the testator. Then too, in the sixth clause of the will in that case, there was a bequest of $5,000 to the Presbyterian Board of foreign missions, a corporation organized by chapter 187 of the Laws of 1862. The act was silent as to the two months limitation, and the bequest was held valid by the Supreme Court, and all parties acquiesced in the decision. In the case of *Chamberlain* v. *Chamberlain*, although the claim that a bequest to a foreign religious and charitable society was void, on the ground that the will was executed less than two months previous to the testator's death, does not seem to have been raised, yet the point was in the case and was not probably overlooked,

and the bequest was upheld.  In *Lefevre* v. *Lefevre* the corporation to which a bequest was adjudged invalid was by express enactment subjected to the restrictions of the act of 1848, and none of the counsel engaged, or of the judges of this court in which the case was very fully considered, entertained the idea that the bequest was condemned on the ground of public policy, independently of express statutory inhibition. In *Stephenson* v. *Short* there was a bequest to the Baptist Missionary Convention of the State of New York, a society not organized under the act of 1848, but under a special charter, in a will executed less than two months prior to the death of the testator, and it was held that it was invalid, because by an amendment of the charter of the corporation in 1862, the limitations contained in the act of 1848 were made applicable to it.

I conclude therefore, that the two months limitation, contained in the act of 1848, applies exclusively in terms to corporations formed under that act, and that there is no public policy established either by statute law or judicial decisions or general consent, which authorizes us to enforce that limitation against domestic corporations which are not expressly subjected to it by statute, and hence that it cannot be enforced against foreign corporations which are authorized by their charters to take property by devise or bequest, free from a similar limitation in the State of their creation.

This conclusion makes it necessary for us to examine another point.  If the bequests to the two foreign corporations be measured as payable at the death of the testator, they amount to more than one-half of the testator's estate.  It is conceded that chapter 360 of the Laws of 1860 applies to this case, and that act provides that no person having a wife, etc., shall devise or bequeath to any corporation of the class to which the appellants belong, in trust or otherwise, more than one-half part of his or her estate, after paying his or her debts. The sums bequeathed to these corporations are first given for life to other persons, and they are to be paid to these corporations after the death of the other persons named.  It is

contended on behalf of the plaintiff, that for the purpose of ascertaining whether the bequests exceed one-half of the estate, they are to be taken just as if they vested, and were payable to these corporations without any delay after the death of the testator. On the other hand it is claimed that in ascertaining whether the corporations take more than half of the estate, the fact is to be taken into consideration that they are not to receive the money bequeathed to them, until many years after the testator's death; and that in the mean time the other persons named are to receive the income and benefit of it. How is it to be determined whether the testator has given more than one half of his estate? I answer, by ascertaining the value of his estate and then determining whether he has given more than half of such value. There can be no other way. If the whole estate is real property, and a portion of that is devised, then the value of the whole and the value of the portion given must both be estimated; and the same method must be adopted if the estate consists of bonds or other personal property, and a portion is given in kind. To ascertain whether a testator has given more than one-half of his estate, his whole estate must be treated as converted into money at his death, and if the money value of the portion given is not more than one-half, then the statute has not been violated. Suppose a testator has an estate consisting of two farms of equal value, one for the life of A. whose age is twenty, and the other for the life of B. whose age is thirty, and he devises the former to a charitable corporation and the other to his son; it is evident that he has given more than one-half of his estate to the corporation. But the devise is valid to the extent of one-half. How is that half to be ascertained? Clearly by estimating in some way the present value in money of his interest in each farm. Instead of land, suppose he was entitled to the annual income of $100,000, at five per cent, for the life of A. and of the same sum for the life of B. The value of his whole estate would be determined by ascertaining the present value of two annuities of $5,000, each, for the respective lives of A. and B. and that would be a sum which would at his death

purchase such annuities.    The following apt illustrations are taken from the brief of the learned counsel for the appellants: "Suppose a testator has one estate for the life of his son in a certain fund of $100,000, and an estate in remainder after the death of his son in another fund of $100,000, and he leaves his interest in the former fund to his son, and his interest in the latter to charitable uses.    Suppose, instead, he was the absolute owner of a fund of $100,000, and gives it to his son for life, and in remainder to charitable uses.    The testator would have left precisely the same estate in the two cases, and the proportional part of it devoted to charitable uses would be precisely the same.    No possible difference can be suggested between the two cases, for the purposes of the act of 1860, yet no one would claim that in the former case, if the son were twenty years of age, the gift to him would not be greater than that to charitable uses.    Suppose, again, a testator left an interest for the life of some person in a fund of $100,000, and an interest as absolute owner in another fund of the same amount, and should give the former to his son and the latter to charitable uses, would there be any doubt that more than half his estate had been given to charitable uses, although the *corpus* of the two gifts would be the same."

It may be said that in all these calculations there is an element of uncertainty, as the duration of the lives cannot be accurately ascertained.    That is doubtless so; but there is the same uncertainty in all cases involving annuities and in all the business of life insurance, and yet there is sufficient certainty for business affairs and the administration of justice.    The value of the estate in a case like this must be determined at the death of the testator, and that must be ascertained by the help of annuity tables and such other means as are in any case available.    There is no present uncertainty in the value thus ascertained for the purpose of sale, purchase or legal administration.    The life of the annuitant may turn out to be longer or shorter than the years given in the table used; but that is a future event then unknown, and does not enter into any

calculation of present value in such a case. Any estimate of the present value of land or of securities may prove to be fallacious. Something unforeseen and unexpected may in the near future happen and largely increase or diminish the estimated value. But the future events thus affecting value have nothing whatever to do with present value; that must be estimated upon the facts as they presently exist, or can presently be seen or ascertained.

In *Chamberlain* v. *Chamberlain* it was held that the value of the widow's right of dower must be deducted before estimating the value of the testator's estate, and the same rules must be used for ascertaining such value, and there is the same element of uncertainty in such a case as in this.

Here the testator divided that portion of his estate which we are now considering into two parts, and he gave one part for the lives of the persons named to them, and the other part to the corporations, the two parts being just equal to the whole. The present value of the life estates, computed according to tables provided for that purpose, and the present value of the remainders would together be the precise value of the estate at the death of the testator. In other words, take out of the estate such sums as would purchase for the annuitants the annuities to which they are entitled, and what remains would be the value which is given to these corporations.

That this is the only practicable rule for computing values in such a case is still further illustrated as follows : Suppose a testator gives $50,000, a portion of his estate, to a corporation for the life of some person, or for a definite period of fifty years, and then gives the remainder of his estate to his son. Does he give the corporation nothing? All will admit that he does; but he does not give $50,000 to the corporation and also $50,000 to his son. The only way to ascertain what each gets is to ascertain the present value of what is given to each. I can conceive of no other possible way in such a case for computing the values and ascertaining whether the law has been violated.

It is undisputed that if the computation of values be made in this way the testator does not bequeath more than half of his estate to these corporations.

The result is that the judgment of the General Term should be reversed, and that of the Special Term modified so as to conform to this opinion; the costs of all parties upon the appeals to the General Term, and to this court, to be paid out of the estate.

All concur except Ruger, Ch. J., not voting.

Judgment accordingly.